Good morning. Before we begin, let me simply note that we sit today as a panel of three, a panel consisting of our newest member of the court, Judge Meadey, whom I welcome on behalf of the entire court. This is actually not his first experience on the bench. His maiden voyage was, in fact, an embankment last month, which I can assure you is one heck of a way of beginning your experience as a member of the Court of Appeals. I went through the same experience a good many years ago. But be that as it may, we welcome you, your service with us on the Third Circuit. Thank you, Chief. That said, this is a panel that consists also of probably the two tallest members of the Third Circuit, and all I can tell you is it is intimidating as a guy 5'8 to be wedged between these two guys. Fortunately, we have chairs to kind of even things out somewhat. The one matter that is listed for this morning is Jaludi v. City Group, and I believe we will begin with argument from Mr. Blustein. Mr. Chief Judge, Your Honors, and may it please the Court. My name is Adam Blustein, and I, along with my co-counsel, Ms. Malillo, will address the retroactivity issue. Let me begin with what is essentially just a housekeeping matter, I think, and that is I want to make sure that I understand the condition of the record and that the district court has properly compelled arbitration of the RICO claim. That is not an issue in this case. The reason I ask the question is because your appeal, Mr. Jaludi's appeal, is from the entire judgment, and I wanted to be clear that we're addressing only the Sarbanes-Oxley Dodd-Frank issue here. Yes, Your Honor. All right, thank you. Your Honors, in 2009, Mr. Jaludi and City Group agreed to an arbitration policy which required arbitration of SOX claims. In 2010, Congress enacted the Dodd-Frank Act, which said you could no longer require the arbitration of such claims. Thereafter, City Group and Mr. Jaludi agreed to a brand new arbitration policy, one that did not require arbitration of SOX claims. The district court was thus wrong to compel Mr. Jaludi's SOX claim to arbitration under an agreement that was superseded. It was superseded under the plain language of the agreements as well as basic principles of contract law. Okay, I think we're well familiar with the case, Mr. Blustein. Can you speak to the argument that City Group is making in reliance on the first liberty investment case? I understand them to be leaning on language that says when a party seeking to avoid arbitration contends the clause providing for arbitration has been superseded, the presumptions favoring arbitrability must be negated expressly or by clear implication. And then, The response, Your Honor, is that it does, by clear implication, indicate that it supersedes the prior arbitration policy. You acknowledge it doesn't do it expressly, right? Yes, Your Honor. Okay. So what's clear about the later arbitration agreement that shows that SOX arbitrability is meant to be In its 2009 arbitration policy, City Group created provisions by which it could amend its arbitration policy, and it followed those provisions to the T. In its earlier arbitration policy, City Group said that it could revise, amend, modify, or discontinue the arbitration policy with 30 days' written notice. And that's what it did, Your Honor. It created a new arbitration policy after Dodd-Frank, and it asked Mr. Geludi to agree to that policy within 30 days. Okay. So they followed their own rules to amend, but you can amend things in part without amending things completely. I take their argument to be, and they'll speak for language of that new arbitration agreement that clearly implies that they meant to change everything about the 2009 agreement. Your Honor, actually, the position is not even that they intended to change anything. The only thing that they changed from the first arbitration policy to the second arbitration policy was that the first explicitly mentioned Sarbanes-Oxley, and the second didn't. It eliminated it. Also, in the second policy, City Group said that other than disputes which by statute are not arbitrable, the remaining disputes are arbitrable. So your position then is essentially one of plain language of the documents. We can put them side by side, and clearly Sarbanes-Oxley is included in arbitration under 2009. Clearly, by implication, it has been excluded in Was that quoted language essentially dicta in that case? You're familiar with the language that is being referred to? Because there would otherwise be some Your Honor, I cannot say for sure whether that was or was not dicta. However, this court has said that when deciding whether a particular dispute should go to arbitration, it's a matter of first determining whether there's a valid agreement. Well, and that's a question for state law, correct? Correct. Second question is what? Whether a particular arbitration agreement covers the scope of an agreement, of a dispute. And is that a question of federal or state law? I do see I'm out of time. May I answer? You're free to answer the question. That would be a question of federal law under the policy favoring Do we need to even get to the second question here? No, we do not, because the first arbitration policy was superseded when Citigroup followed its own provisions, and when it said in its handbook, which contains these policies, that the latter policy supersedes the earlier policy. Judge Mady, because the two I appreciate that, Chief, and I certainly don't consider it monopolization, but thank you. Tell me more about the state law genesis of this agreement, because as I understand what you're arguing, you've now said we don't even need to reach the presumption in favor of arbitrability that's governed by federal law. So tell me more about why state law clearly resolves this case. Because it's a two-part question, and the first question, I'm backtracking a bit here, does answer whether a valid arbitration agreement even exists. And the crucial point is that the parties do not disagree that the first arbitration agreement covers SOX claims. The latter arbitration policy does not cover SOX claims because it cannot, after Dodd-Frank, cover the So there is no dispute about the second part of the question, whether a particular agreement covers the dispute at hand, in this case, whether SOX should be arbitrated. That is why it's only the first question that needs to be answered, whether a valid arbitration agreement exists to arbitrate SOX claims. And what Citigroup did was replace its first arbitration agreement with one that removed any mention of SOX in reaction to an enactment of Congress, the Dodd-Frank Act. And, well, we don't know, so that's what they did, right? I mean, you're not, we don't know why they didn't do it. We know that there's two contracts, and I think what we need to do is read the plain language of those agreements, not try to speculate as to what their intent was, right? Yes, Your Honor, the plain language is certainly the first part of it, and that in and of itself shows that the first policy was superseded. Citigroup says it. We don't need to reach the question of intent, do we? I mean, if the plain language says what it says, the plain language says what it says. Yes. Yes, Your Honor. I mean, the contemporaneity of the deletion certainly might suggest something, but we don't have to do that, do we? That is correct, Your Honor. All right, thank you. We'll have you back on rebuttal. Thank you. Ms. Malillo? May it please the Court, my name is Sydney Malillo, and I will address the retroactivity question. Applying the Dodd-Frank Anti-Arbitration Amendment to Mr. Landgraf in 2013 does not have an impermissible retroactive effect under the third step of the Landgraf analysis for two reasons. First, its application does not disrupt the party's notions of settled expectations, reasonable reliance, or fair notice. Second, the statute is merely jurisdictional and thus does not raise any retroactivity concerns. To my first point, under Landgraf and its progeny, the retroactivity inquiry demands a common-sense, functional judgment that can be guided by familiar considerations of fair notice, settled expectations, and reasonable reliance. Under this... I know you want to hit that one first, but with limited time, let me take you to your second point, because you hit it pretty hard in your briefing too, Ms. Malillo. Speak to the old discount case, if you would, please. Your opponents point out that that precedent of ours says that in the context of arbitration, a litigant's procedural right to the agreed form is raised to a substantive right by the FAA. So, in light of what we've said in old discount, how can you argue that this is merely a procedural right and therefore substantive rights aren't implicated? I guess my response to that would be twofold. First off, as we stated in our reply brief on pages 26 and 28, the Supreme Court in Greenwood determined that the FAA generally does apply and does have a liberal policy favoring arbitration unless overridden by express congressional command. And significantly, they provided an illustrative example, which reads, no pre-dispute arbitration agreement shall be valid or enforceable if the agreement requires arbitration under this section, which directly tracks... You're talking about substantive rights at that point, though, aren't you? I mean, the question is, is this a substantive right or is it a procedural right? You've argued strenuously in your papers that it's merely procedural. It's only a jurisdictional question. It's where it's going to be decided, not whether it's going to be decided. So don't worry about it. You don't have to worry about retroactivity. I'm trying to get you to respond to their argument that old discount says that's just not so. This is a substantive right. Is it a substantive right or not? And if you're saying it's not a substantive right, how do we deal with old discount? The Supreme Court in Mitsubishi stated that an arbitration clause in a contract... They addressed an arbitration clause in a contract and determined that because the arbitration appeared in the contract, it does not... Submitting a resolution to an arbitrable forum rather than a judicial forum does not affect substantive rights. So I think the Supreme Court has responded to that. So you think that Mitsubishi effectively makes whatever we said an old discount inaccurate? I wouldn't say inaccurate. I would just... Well, there are two different things, right? I mean, either we got it right in old discount or we didn't, and that's what I'm trying to get you to address. I would just emphasize that the Supreme Court has repeatedly held that contracting parties agreeing to arbitration do not forego any substantive rights but merely submit their claims to a different forum. So the inverse of that is agreeing... Taking something out of arbitration and into a judicial forum has the same effect. It doesn't affect substantive rights, but rather merely changes the tribunal that will hear the case. Let me ask a question, the answer to which may be obvious, but we're dealing here at the early stages of the litigation. That is, we're looking at not only a complaint but a pro se complaint. But am I correct that what the complaint raises is a Sarbanes-Oxley claim based on the April 2013 termination? I ask that question because there is a short series of other adverse employment actions here, at least one of which I think would have predated the effectiveness of Dodd-Frank. So I want to be clear that what we're talking about for purposes of the applicability of Dodd-Frank is merely the termination. Yes, Your Honor, and even so, even if there was conduct antedating the statute, the Supreme Court and this Court has not automatically rendered a statute application to a particular dispute as impermissibly retroactive when some conduct occurs prior to the enactment of the statute, if that conduct continues thereafter, which in this case it has. Back to my first point about the settled expectations, Citigroup's own conduct illustrates that they were on notice of the Dodd-Frank amendment because whether by circumstantial evidence alone, they updated their arbitration policy to no longer require mandatory arbitration of Sarbanes-Oxley claims. Furthermore, Citigroup's own contractual language controverts any argument that their parties' settled expectations would be affected. On page 31 of the supplemental appendix, the policy states that these policies and benefits are constantly under review and it is the employee's duty to keep themselves up to date. Furthermore, on that same page of the supplemental appendix, this policy states that the provisions of this handbook do not supersede any law and where a specific law, like in this case, is more generous than a particular provision, then that law applies. And lastly, on page 71 of the supplemental appendix, in the arbitration policy, the Citigroup expressly accounts for future statutory amendments when it states that the policy covers the statutes that are listed, which in the 2009 arbitration agreement was Sarbanes-Oxley, and all amendments thereto, which by the effect of the Dodd-Frank Act, Sarbanes-Oxley was amended. Okay. Let's talk for a minute about the DeWeese case, which, again, you rely on. And what is the event here that is important, right? DeWeese tells us to look to a specific event to decide whether something's hidden in a retroactive way or not. What's the event here that we should be paying attention to? The 2013 termination. Okay. Is the agreement to arbitrate, is that entering into that agreement? Why isn't that the relevant event? First off... 2009, I mean the 2009. First off, because the 2011 agreement was entered into in 2011, and then the termination was entered into in 2013. So the effect of that 2009 agreement, whether it applies or not to this case, the conduct giving rise to the dispute was the termination of Mr. Jaluti. That is what prompted his whistleblowing claim. And that is the relevant conduct. So if we were to disagree about whether a substantive right was vesting in 2009, and we thought this was a substantive event, I mean a substantive right, why isn't that 2009 contractual agreement really the point, like in DeWeese, that we should be paying attention to? I think because the retroactivity inquiry is demanded by familiar considerations of fair notice and reasonable reliance, and it runs against common sense in a functional judgment as Landgraf requires to reasonably rely on a provision that was rendered unenforceable and invalid by federal law in 2010, to which Citigroup itself amended their contract to comport with. So I think with considerations of reasonable reliance and fair notice and several expectations taken alike, this does not affect the party's substantive rights in an impermissible, retroactive way. Okay. Thank you. I see I've run out of time. Are there questions from the panel? Thank you very much. Mr. Lindhorst. Morning, your honors. My name is Tom Lindhorst with Morgan Lewis, and I'll be arguing on behalf of Citigroup.  Your honors, this court should affirm the district court and its order compelling Mr. Geludi to arbitrate his Sarbanes-Oxley claim because the parties to this action indisputably entered into an arbitration agreement in 2009 to arbitrate Sarbanes-Oxley claims. If we determine that the 2011 handbook is what applies here, that's game, set, and match. You lose, don't you? The 2011 agreement does not require arbitration of his Sarbanes-Oxley claim. So if there was no 2009 agreement, we could not compel arbitration of that claim. So if that's the case, what is it about the 2000... ...except the ones that are not arbitrable by statute, and there's no mention of Sarbanes-Oxley, why in looking at that later one would we say, well, you know what? We think Sarbanes-Oxley is still arbitrable. What's the reasoning in looking at the plain language of 2011 that would lead us to say, hey, we ought to go back to 2009 and say that's arbitrable? Because the 2011 agreement says nothing about how Sarbanes-Oxley disputes will be resolved. It doesn't say they'll be resolved in court the way some of the subsequent agreements did in the cases relied upon by plain language. Let's stop just a minute. When you say it says nothing, the 2011 agreement says except as forbidden by statute. It says that. That is what the Dodd-Frank... Maybe I should take a step back. Do you disagree that the Dodd-Frank amendments to Sarbanes-Oxley specifically say Sox claims will not be subject to arbitration? Do you disagree with that? The statute says that an agreement, a pre-dispute arbitration agreement of a Sox claim is invalid. Which is what we're talking about here, right? Correct. So it falls directly within the Dodd-Frank amendment, right? It does. Okay. So if you choose, your client chooses to put into its 2011 agreement language that says you're going to arbitrate everything except things that are forbidden by statute to be arbitrable, and you agree that the Dodd-Frank amendment exactly says that, how can you say to us this says nothing about how to treat a Sarbanes-Oxley claim? Isn't it treated by that very language that you inserted that says except for things forbidden by statute? I'm using that loosely and it's not a direct quote. It says under this agreement you are not required to arbitrate those types of claims, which we would agree at that time would include a Sarbanes-Oxley claim. It doesn't say what happens thereafter. And it doesn't say we argue... Just a retroactive analysis, can you ground us in the language of the agreement? The language of the agreement which says disputes which by statute are not arbitrable. What does that mean? It means in this context that if there's a statute that says this claim cannot be subject to a pre-dispute arbitration agreement, it is not subject to arbitration under this agreement. So it's necessarily a limited arbitration agreement. Here are the claims that you are required by agreeing to this to arbitrate. There are claims that you're not agreeing to arbitrate. You're not agreeing to arbitrate non-employment claims, you're not agreeing to arbitrate consumer claims, you're not agreeing to arbitrate workers' comp claims, so on and so forth. So it enumerates the claims that under this agreement you're obligated to arbitrate, which is not all claims, and there are claims that fall outside of the scope of this arbitration agreement which will be dealt with elsewhere. If there's no other agreement they would be dealt with how they are dealt with under the law, but if there's another agreement, nothing in this agreement says we're going to say now that agreement is invalid, that agreement is superseded, and we are going to litigate Sarbanes-Oxley claims in court. It says none of that. Oh, and it's true that we said nothing about Sarbanes-Oxley in this after saying that language, but what we really meant was you're still going to arbitrate Sarbanes-Oxley. That's the arc of your logic, right? It depends. If I'm hired in... No, it depends. I'm just like, that's a yes or no. The arc of your logic is it has to be back to 2009 because this doesn't say specifically in language, in hot verba, and you'll never have to arbitrate Sarbanes-Oxley again. It doesn't say that. It doesn't say this supersedes the 2009 agreement. It doesn't say this amends the 2009 agreement. It doesn't say this is the complete expression of the parties. Did you follow the exact pattern that you had laid out in your 2009 agreement for amending that agreement? The 2009 agreement said an amendment might be communicated with an updated handbook or by standalone agreement. The 2011 agreement... That's just a straight up question and you can explain it, but did you or did you not, you being your client obviously, follow the exact pattern laid out in the 2009 agreement for how you were going to amend and change your arbitration agreement? The answer is yes. We said an amendment may be communicated with an updated handbook. We might have said we're going to post the amendment on the bulletin board. That doesn't mean everything we put on the bulletin board is an amendment. The question still is, is it an amendment? And you look at the 2011 agreement and there's no indication that it's an amendment. It's not called an amendment. There's no indication that this different language is an amendment to the 2009? No. If I was hired in 2011, it amends absolutely nothing. That just strikes me as a tough argument to make, Mr. Arnor. I won't take your time, but we could go back... I don't know how tough it is to make, but it may be a little tough for me to accept. We could go back and walk through step by step and show, yeah, that is exactly what you did. So any logical reading of this would imply you did it because you meant to amend it and you in fact did amend it. Isn't that a question of state law, counsel? Isn't what a question of state law? Isn't a question of whether or not these two agreements can be read together or whether the second supersedes it, a question of Pennsylvania state law? No, Your Honor. No. First Liberty Investment Group, which we've heard about before, and Patent and Securities Corp, this court has said, and it is the law of this circuit, that the issue of whether an arbitration agreement has been superseded by a subsequent agreement is one of federal law and one to which the presumptions in favor of arbitration apply. And fundamentally, that makes sense because it's a scope question. How does Dasher from the Sixth Circuit and applied energetics from the Second Circuit affect your argument? In both those cases, particularly in Dasher, it was pretty clear that they said this is not about the scope. Yeah, Dasher did say that. But what Dasher addressed was a total agreement governing the relationship of the parties, an account contract. In the first account, it covered a lot of terms, one of which may or may not have been arbitration. In the first agreement, it did include an arbitration provision within the overall agreement. In the second agreement, there was no arbitration provision. And what Dasher said was we're looking at a question of whether this total overall relationship agreement was superseded in its entirety. Right. And they said that's a question. That's not about scope. That's a question about whether they agreed to arbitrate or not. In light of your own earlier argument, which I take to be we said nothing in 2011 about Sarbanes-Oxley, why isn't that a concession sort of the Dasher nature that says we're talking about whether there was an agreement, not scope? We said nothing, so there isn't there, not scope. The question is, looking at the two arbitration agreements, indisputably formed, what is the scope of the parties' agreement to arbitrate after we interpret those two agreements? And in particular, what was our contractual agreement in the second one? Was it broad enough to extinguish our contractual arbitration agreement in the first one? So in other words, you can't answer the question by putting the word scope into the question. That is the question. The question is, is this about scope or is it about whether or not you arbitrate? So framing the question as the question is whether this is within the scope doesn't assist us in getting to the answer. The question is, when you've got a 2011 arbitration agreement, which by your account says nothing about arbitrating a SOX claim, does that mean you're talking about scope or does that mean you're talking about whether it's there at all as an agreement to arbitrate? Isn't the logic that you're pressing on the one hand about it's not there so it's not superseded actually hurting you when you have to get to the point of saying it's about scope? If you say it's not there, aren't you acknowledging it's not there means there's no agreement to arbitrate? We're on question one, not question two. The way we got to the answer that the 2011 agreement doesn't supersede the 2009 agreement and doesn't have an alternative agreement as to the resolution of Sarbanes-Oxley claims is by interpreting the scope of that agreement. If that agreement covered the subject of dispute resolution of Sarbanes-Oxley claims by saying, for example, they're in court or by saying, for example, this supersedes the prior agreement, then we would have concluded that it obviated the 2009 agreement. But by interpreting the scope of that agreement, we determined that it fell short of that. And Dasher, again, distinguished this court case in patent securities group by saying, we're talking in Dasher about this overall relationship agreement that covers a wide variety of terms, a second agreement that covers a wide variety of terms with no arbitration agreement. We declined to decide in footnote eight of Dasher the situation that was in patent, which is when we're just talking about the arbitration provision. And we're just talking about an amendment or a superseding or a waiver of that provision, we don't answer the question of whether or not the FAA and the presumptions in favor of arbitration apply. I'm just a little confused because I really thought I heard you say, and in the briefing I thought I saw that everybody agreed that Sarbanes-Oxley is in the 2009. And everybody agreed that Sarbanes-Oxley is not mentioned or in the 2011. That's plain, isn't it, sir? That's plain, isn't it? Correct. So if everybody's agreeing to that, I'm just puzzled about why you're making a scope argument because nobody seems to be arguing about the scope. What people seem to be arguing about is not how big this thing is. They seem to be arguing, so since it's not in 2011, does that mean we agreed to arbitrate or not? Not scope, but did we agree to arbitrate or not? If everybody's agreed on the scope, how can we be arguing about scope? Well, we're arguing about scope in the sense of did the 2011 agreement extinguish the 2009 agreement? We know that the scope of the 2009 agreement includes it. We know that the 2011 agreement does not include an obligation to arbitrate. That in and of itself would not extinguish the 2009 agreement. What might extinguish it would be an integration clause, a reference to an amendment, an indication that it supersedes prior arbitration agreements. Those are the interpretations. If we thought we were on question one, you'd have to agree we were on a state law question, right, and the presumption for arbitrability wouldn't apply. I'm sorry, what's question one under your? If we disagreed with you that this was a question two, that is a scope question, and we thought we were at question one, that is whether there's an arbitration agreement at all, at that point it's a state law question, correct? Correct. How do you win under state law?  I didn't hear you. We were both talking at the same time. The formation of a contract is really not in dispute. That's the state law question. The question of whether there was ever any arbitration agreement at all is a state law question that gets answered without the presumptions of arbitrability. Did we have an offer? Did we have acceptance? Did we have consideration? All of that was met here. The question, if we're going to assume, as we do, as the Supreme Court has in first absence of Chicago, that if we know you agreed to arbitrate something, we will assume you agreed to arbitrate this dispute unless you overcome the presumptions, then the presumption is all the more appropriate here. Wait, wait, wait. If you're saying, your argument is if there's an agreement to arbitrate something, there's an agreement to arbitrate everything? No, no. If there's an agreement to arbitrate of some scope, the law will assume that the scope extends to the instant dispute unless it's overcome by the party resisting arbitration. That's first options of Chicago Supreme Court black letter law. So if there's an agreement to arbitrate, say, all tort claims arising from a certain action, and somebody comes in and says, I have a contract dispute, the assumption, the presumption is you're arbitrating everything. The presumption obviously can't overcome the clear intent of the parties. It's not to negate the clear terms of the contract. That's not the presumption. But my point is, if the presumption is going to be triggered simply because we know you're agreeing to arbitrate something, here we know the parties formed a valid arbitration agreement of this dispute, of a Sarbanes-Oxley claim, and therefore the question of what happened to that dispute in the party's subsequent contractual relations is all the more reason to apply the presumption in favor of arbitration because we're further down the road than the typical situation in which the presumption applies. Let me ask you about an additional argument you made toward the end of your brief and suggested that one way we could affirm the district court here is on the alternative ground that an arbitrator, not the court, should decide the question of arbitrability. You weighed that argument in the district court, did you not? We made it to the magistrate judge. We did not make it to the district judge. Any other questions? Thank you, Mr. Lynch. We will hear from Mr. Blustein on rebuttal. Your Honors, we have three points on rebuttal. First, as my colleague indicated, the second arbitration policy says nothing about how claims should be adjudicated. But what we know is that it says that they're not going to be adjudicated in arbitration in front of FINRA or AAA. How do you know that? Because speak to his argument directly. His argument is it says it's not the exclusive. Arbitration is not going to be the exclusive way we deal with this. But it doesn't say it won't be arbitrated. In the sum, I take that to be the assertion. Mr. Jordan, I would answer that with the language that you quoted earlier, in that the second arbitration agreement says that the only disputes which are arbitrable are those by which statute allows them to be arbitrable, or the inverse. In Collier v. National Penn Bank in the Pennsylvania Superior Court, a latter agreement said that claims would not be arbitrated. They would be handled by the bank or in court. That court said that it is clear that the parties intended for disputes not to be arbitrated. Here we have the same thing. We have a latter arbitration agreement. No, it does not say that claims should be handled in court or any other means of adjudication, but it says they're not going to be arbitrated. They say that because the Pennsylvania Supreme Court found that those were inconsistent provisions. I think what your adversary would say is, well, that's our whole point. They're not inconsistent. They can be read harmoniously, so Collier doesn't help us. Well, there is no harmony, Your Honor. One arbitration agreement, the former one, requires arbitration of SOX claims. The second one specifically says we're not going to arbitrate SOX claims. Well, if it says that, it would be great because then we wouldn't be here, but it doesn't say that. What it says is it won't be the exclusive way. It says this is our exclusive set of things, and it doesn't mention Sarbanes-Oxley, but it doesn't say we won't arbitrate Sarbanes-Oxley. That's the whole fight. So how do you get around their assertion, which is since it doesn't say we won't, you go back to 2009? It doesn't require the arbitration of SOX claims, and Mr. Giuliani doesn't want to arbitrate his SOX claims. That's how we get around it. The second one doesn't require the arbitration, and he doesn't want to, and the only other court to look at these arbitration agreements, which is the Northern District of Illinois in Lysak v. Citibank, specifically said that because Citigroup knows how to preserve prior policies, in its 2011 handbook it specifically states that its code of conduct is not superseded. If my colleagues will indulge me, they make an argument which I'm not sure you responded to, which hangs on a preposition that there was a difference in the 2013 arbitration agreement that was at issue in Lysak because it talked about being subsequent to or inconsistent with, and here it had to be subsequent to and inconsistent with, and that's important because Lysak only said it's subsequent to and that's enough. It never addressed the point you're trying to address, which is inconsistent with. Do you have a response to that? Yes, regardless of the preposition, the 2009 arbitration policy is inconsistent with the one that Citigroup released in 2011. Going back to the first one requires its employees to arbitrate SOX claims, and the latter one simply does not require it, and Mr. Giuludi does not require it. I am out of time, but I'll end with this, that these two policies are both called the employment arbitration policy. They're not called the 2009 employment arbitration agreement and the 2011 arbitration agreement that Citigroup has called them in this litigation. They are both called the employment arbitration policy, and Ms. Melillo spoke about common sense. It can only be common sense that if Citigroup released a second arbitration policy and called it the arbitration policy, then that's the one that governs. Thank you. Thank you very much. A thank you to all of counsel for your very helpful briefs, for your very helpful arguments. A special thanks to the Drexel Federal Litigation and Appeals Clinic for their work on this case. We'll take it under advisement. Thank you very much.